IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2018

**STATE OF TENNESSEE v. MATTHEW REYNOLDS, ALPHONSO RICHARDSON, CYNTHIA DIANNE SKIPPER, AND DEREK VICCHITTO**

**Appeal from the Circuit Court for Montgomery County**
**No. 41400813        Jill Bartee Ayers, Judge**

_____

**No. M2017-00169-CCA-R3-CD**

_____


For their involvement in the death of the victim, Shirley Beck, the defendants, Matthew Reynolds, Alphonso Richardson, Cynthia Dianne Skipper, and Derek Vicchitto, were charged with one count of first degree murder (count one), one count of felony murder (count two), three counts of aggravated sexual battery (counts three, four, and five), and one count of especially aggravated kidnapping (count six). The trial court dismissed the three aggravated sexual battery counts against all four defendants before a jury convicted them of especially aggravated kidnapping. Additionally, in counts one and two, Defendants Reynolds and Richardson were convicted of first degree murder and felony murder as charged, Defendant Skipper was convicted of two counts of the lesser-included offense of criminally negligent homicide, and Defendant Vicchitto was convicted of two counts of the lesser-included offense of facilitation of second degree murder. The trial court merged each of the defendants' convictions in counts one and two and imposed various sentences to each defendant. For Richardson's convictions, the trial court imposed a life sentence plus twenty-five years which he challenges as excessive on appeal. Richardson, Reynolds, and Skipper challenge the sufficiency of the evidence supporting their convictions, both Richardson and Reynolds argue the trial court erred in instructing the jury, and Vicchitto challenges the trial court's evidentiary ruling denying character evidence offered from his mother at trial. After our review, we affirm the evidence was sufficient to support the defendants' convictions, conclude the trial court properly sentenced Richardson, and determine the trial court did not err in instructing the jury or in denying character evidence on behalf of Vicchitto. However, in merging each of the defendants' convictions in counts one and two, the trial court failed to impose a sentence for the merged conviction. Therefore, we remand the case to the trial court for sentencing and the entry of completed judgment forms as to counts one and two for each defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed; Case Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Matthew Lee Reynolds.

Eric J. Yow, Clarksville, Tennessee, for the appellant, Alphonso Jay Richardson, II.

James R. Potter, Clarksville, Tennessee, for the appellant, Cynthia Dianne Skipper.

Cleveland C. Turner, Clarksville, Tennessee, for the appellant, Derek Moroni Vicchitto.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; John W. Carney, District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

In the early morning hours of June 26, 2014, the defendants beat the victim to death as she hung by her arms from the ceiling of the living room of their shared home. As a result, the defendants were indicted for one count of first degree murder (count one), one count of first degree, felony murder (count two), three counts of aggravated sexual battery (counts three, four, and five), and one count of especially aggravated kidnapping (count six). Tenn. Code Ann. §§ 39-13-202 (a)(1); -202 (a)(2); -504; -305 (a)(4). After a consolidated jury trial, all four defendants were convicted of especially aggravated kidnapping as charged in count six. In counts one and two, Richardson and Reynolds were convicted of first degree and felony murder as charged, Skipper was convicted of two counts of criminally negligent homicide, and Vicchitto was convicted of two counts of facilitation of second degree murder. At trial, the State presented the following facts for the jury's review.

For approximately six weeks prior to her death, the victim served as the "house slave" at 108 Wilson Court in Montgomery County, Tennessee where she lived with Ashley Laughlin, Kristin Wilkerson, and the four defendants. As described at trial, the victim participated in the BDSM community wherein she entered into a contract with

Twila Ours, an established BDSM mistress, to serve as her house slave.[1]  According to Ms. Ours, a hierarchy exists within the BDSM community allowing for a power exchange between the participants through the roles of slave, submissive, dominant, switch, and mistress/master.[2]  In a typical slave/mistress relationship, a slave relinquishes control, retaining only "their moral rights," in exchange for pleasure.  Specifically, slaves "do things for [a mistress] and in return [the mistress] give[s] them the pleasure that they seek."

Ms. Ours suggested the victim sought pleasure through discipline and pain and testified she entered into a contract with the victim establishing the boundaries of their relationship in November 2013.  As such, the victim lived with and "belong[ed] to [Ms. Ours]."  Ms. Ours served as "payee" for the victim's disability payments, managed the victim's finances, and disciplined the victim pursuant to her status as house slave.  At trial, Ms. Ours detailed common sense rules she followed while disciplining her slaves.  For example, she always stopped discipline sessions upon hearing a slave's safe word or if the slave passed out and she avoided punishing areas of a slave's body that could result in "internal damage."  In her nearly thirty years as a BDSM mistress, Ms. Ours has never killed one of her slaves.

In May 2014, Ms. Laughlin, a resident of 108 Wilson Court and Ms. Ours' surrogate daughter, underwent surgery and needed help around the house.  Consequently, Ms. Ours sent the victim to Wilson Court to help Ms. Laughlin and to carry out her contract as a house slave.  As the Wilson Court house slave, the victim was expected "to help wash dishes, clean the house, vacuum the floors, help walk the dogs, [and] help [Ms. Laughlin] when [she] needed help getting around the house."  During her time at Wilson Court, Skipper served as the victim's mistress and was in charge of disciplining her while Vicchitto participated as a switch.  According to trial testimony, however, neither Ms. Laughlin, nor Ms. Wilkerson, nor Richardson, nor Reynolds participated in the BDSM lifestyle.

The beating which led to the victim's death began after Skipper ordered a discipline session around midnight on June 26, 2014.  The discipline session arose after Richardson accused the victim of trying to poison him and Ms. Laughlin by placing boric acid on their drinking cups.  Pursuant to Skipper's orders, the victim was initially hung by her arms from an eyebolt nailed to the ceiling and beaten in Skipper's bedroom.  However, in order to not damage the electronics in the bedroom, Vicchitto moved the victim to the living room where she was again hung from the ceiling by her arms and

---

[1]"BDSM" is an acronym referencing the community and/or lifestyle of bondage and discipline, dominance and submission, and sadism and masochism.

[2]Ms. Ours defined a switch as a BDSM participant who acts as both a submissive and a dominant depending on their mood.

beaten. For approximately four hours, Ms. Wilkerson and Skipper sat at the dining room table which overlooked the living room area as Richardson, Reynolds, and Vicchitto took turns beating the victim.

Ms. Wilkerson reviewed photographs of the victim from the night of her death. One photograph depicted a dark stain on the victim's clothing indicating she urinated on herself during the beating. In another photograph, Ms. Wilkerson identified Richardson standing in front of the victim as she hung from the ceiling. He was wearing latex gloves and holding a metal pole. During the beating, Richardson "was swinging the pole as if it were a baseball bat" at the victim's waist and legs. Richardson struck the victim with the pole "[a]pproximately ten to fifteen times." The victim "cried out" after each strike. He also "landed a series of kicks and punches" to the victim's "waist, wrist, [and] legs." "[A]t one point he did put his hand around [the victim's] throat" and choked her for approximately thirty seconds.

Vicchitto placed a ball gag in the victim's mouth made from "a rolled up piece of cloth that resembled a sock." During the beating, Ms. Wilkerson heard "moans of some sort and groans" from the victim but she could not decipher any words. She saw Vicchitto strike the victim "approximately ten" times with "what appeared to be segmented pieces of an oxygen hose that he bound together." Ms. Wilkerson also saw Reynolds strike the victim "[w]ith his feet, wrists, arms, knees, shins and feet" in what "appeared to be a series of martial arts moves." Reynolds kicked the victim "more than 50" times in "her waist, torso and legs."

Throughout the beating, Richardson kept count of the number of strikes laid to the victim. Ms. Wilkerson explained, "[t]here was a total number of strikes, and after each one was landed, that particular number was deducted from the total." According to Ms. Wilkerson, Skipper ordered the number of strikes to be exacted against the victim by each participant during the beating. Furthermore, about half-way through the beating, Ms. Wilkerson heard Skipper say "that she did not have to physically touch [the victim] because she had three other people to do that for her."

Ms. Laughlin woke up after midnight on June 26, 2014 and entered the dining room. She saw Ms. Wilkerson, Vicchitto, and Skipper sitting at the dining room table, but she could not see into the living room.[3] When someone turned on the living room light, she saw Richardson standing near the victim who was hanging from the ceiling by her arms. Richardson entered the dining room area and explained the victim "was getting disciplined for a cup." According to Skipper, Vicchitto, and Richardson, the victim placed Ms. Laughlin's cup in boric acid. While in the dining room, however, Ms.

---

[3]Ms. Laughlin also testified she is legally blind.

- 4 -

Laughlin did not see boric acid on her cup. She tried to communicate with the victim but was unable to because "[the victim] had a ball gag in her mouth."

Ms. Laughlin described Richardson as "ranting and raving." She saw him holding a metal pole as he walked back into the living room towards the victim. Ms. Laughlin then heard "three loud cracks" that sounded like "[a] baseball bat." She stated the noise "was loud and bone shattering." After hearing the three loud cracks, Reynolds and Vicchitto took the victim down from the ceiling, removed the ball gag from her mouth, and placed the victim in the shower under cold water in order to revive her. The victim told Ms. Laughlin "she felt like she was going to pass out." Ms. Laughlin then went back to bed between 1:30 and 2:00 a.m.

During the four-hour beating, the victim lost consciousness three times. Each time, Reynolds and Vicchitto took the victim down from her hanging position, revived her, and "placed [her] back up" to resume the beating. After the victim's first loss of consciousness and subsequent re-hanging, Richardson, Reynolds, and Vicchitto resumed the beating. After the victim's second and third loss of consciousness, only Richardson resumed beating her. Approximately three and one half hours into the beating, Ms. Wilkerson described the victim as "[v]ery, very weak. Unable to stand or to verbalize anything." At this time, Reynolds, Skipper, and Vicchitto urged Richardson to stop beating the victim, but he refused. The victim was last taken down from the ceiling "[b]etween 4:00 and 4:15 a.m." Reynolds and Vicchitto took the victim to the bathroom where they attempted to revive her one final time.

In the bathroom, Ms. Wilkerson noticed the victim "was turning slightly gray." The victim "said that her arm hurt, and she wanted her mother." Reynolds and Vicchitto then moved the victim to Skipper's bedroom and Reynolds "walked out of the room." Ms. Wilkerson helped dress the victim and she, Skipper, and Vicchitto tried again to revive her. When the victim failed to respond, Ms. Wilkerson woke up Ms. Laughlin around 4:30 a.m.

Ms. Laughlin performed CPR on the victim but her efforts were unsuccessful. She admitted the victim's body "gave way because it was on the bed," but noted she attempted over one hundred chest compressions during which she did not hear any bones break. As Ms. Laughlin attempted CPR, Vicchitto called 9-1-1. According to Ms. Laughlin, Richardson left the home after Vicchitto dialed 9-1-1 but prior to the police arriving, while Reynolds left before Vicchitto dialed 9-1-1.

Shane Gibbons received the 9-1-1 call placed by Vicchitto on June 26, 2014 and the State played the audio recording of the same at trial. Before police arrived at the scene, however, Skipper, Vicchitto and Ms. Wilkerson created a story to tell the officers.

Ms. Wilkerson explained: "The story was that [] Vicchitto and myself were on our way to Wal-Mart, but we never made it because we saw her, [the victim], on the side of the road." They told officers the victim was beaten, and they brought her back to 108 Wilson Court to help her. While still promoting the false story, Ms. Wilkerson took officers to the parking lot where they supposedly found the victim. However, at trial, Ms. Wilkerson admitted this was a lie told "to deflect blame from anyone in the house" for the victim's death. Ms. Laughlin also initially told officers the story describing the fake assault of the victim.

At approximately 4:53 a.m., Officer Joshua Swaffer responded to 108 Wilson Court. Upon entering the home, he found the victim unconscious on a bed as Ms. Laughlin attempted CPR. Officer Swaffer moved the victim to the floor and continued CPR for about two minutes until EMS arrived. He did not hear or feel any of the victim's ribs breaking while performing CPR but did notice bruises on her neck and arms. Upon asking what happened to the victim, Skipper stated they picked her up on the street after "she was assaulted either by someone or something." Officer Swaffer noted "everybody else kind of chimed in with the same" story.

Officer Matthew Falencik arrived at 108 Wilson Court at approximately 5:00 a.m. He created the crime scene log which was entered into evidence. The log documented Skipper, Vicchitto, Ms. Laughlin, and Ms. Wilkerson's presence in the home on the morning of June 26, 2014. He then went to the intersection where the Wilson Court residents allegedly found the victim and blocked off the scene. At 5:03 a.m., Officer Beau Skinner arrived at 108 Wilson Court. He observed the victim's body, noting she had visible abrasions covering her body. Officer Skinner spoke to Skipper and Vicchitto who stated the victim left the home "an hour or two prior to the nine-one-one call being made." Vicchitto further explained he saw the victim lying in a parking lot after an assault. Vicchitto stated the victim did not want to go to the hospital, so "he put her in the vehicle with him and took her back to the house, where once in the residence she collapsed and they called nine-one-one." Vicchitto then directed Officer Skinner to the area where Vicchitto claimed he found the victim, but "he was vague as to where he initially located her." After several minutes, Vicchitto indicated he saw the victim "partially sitting up" on the "handicap parking decal on the actual parking lot of 1718 Memorial." Officer Skinner secured the area as a crime scene, but found no evidence relating to the victim.

Sean Bartram, an expert in the field of critical care paramedics, responded to the scene at 108 Wilson Court at approximately 5:00 a.m. He found the victim unconscious and unresponsive on the floor in a bedroom. After placing the victim on a cardiac monitor, Mr. Bartram noted no electrical activity of the victim's heart and saw she

- 6 -

suffered "traumatic injuries throughout her entire body that were not life sustaining." Mr. Bartram described the victim's injuries, as follows:

> She had multiple signs of trauma, pretty much covering her entire body from head to feet, front and back. . . . There was a significant horizontal, across the chest, contusion as well as the midshaft femur region, a significant horizontal contusion as well. Multiple abrasions, multiple lacerations, multiple contusions throughout the body. Some more significant than others.

Mr. Bartram pronounced the victim dead at approximately 5:03 a.m.

At 2:20 p.m. on June 26, 2014, Officer Joel Gibbons located Richardson and Reynolds at the Hilldale Laundromat. He noted the laundromat was less than a mile from the 108 Wilson Court residence. Officer Gibbons saw Richardson inside the laundromat on his cell phone. He found Reynolds outside the laundromat and arrested him.

Officer William King collected evidence from the living room/dining room area and the master bedroom of 108 Wilson Court. From behind the dresser, in the dresser drawers, and within a large bag found in the closet of the master bedroom, Officer King collected multiple whips and handcuffs, red leather wrist straps, a lock and key, a purple Tootsie Roll Pop doll, a black belt, clothespins, an Army cot pole, a carabiner, eye bolts, and a wooden bar. He also found Vicchitto's Nokia cell phone on the bed. In the living room/dining room area, he collected a broken blind rod, a television cable, a whip, a Batman cup, and a Steelers cup. Officer King did not notice boric acid on either of the cups and he did not find boric acid in the home during his investigation. He also obtained DNA swabs from the defendants while on the scene. Officer Gregory Beebe recovered a pair of tennis shoes from Reynolds which were entered into evidence.

Officer Jason Hankins downloaded pictures from Vicchitto's Nokia cell phone. The State entered four pictures from the cell phone into evidence. The pictures were taken on June 26, 2014 at 12:32 a.m., 1:25 a.m., 1:35 a.m., and 1:50 a.m. Each picture showed the victim hanging from the ceiling of the living room by her arms.

Officer Thomas Johnson created a sketch of the crime scene at 108 Wilson Court which showed two rooms, including the bedroom and the living room/dining room area. In the sketch, the victim's body is seen on the floor of the bedroom. Officer Darren Koski took photographs of the crime scene. He photographed the layout of the rooms, a hole in the ceiling of the bedroom, a hole in the ceiling of the living room, the bathroom, the two cups collected from the dining room, and a metal bar. He also took buccal swabs from Skipper, Vicchitto, Reynolds, Richardson, and Ms. Wilkerson.

Kendall Stoner, an expert in the area of DNA analysis with the Tennessee Bureau of Investigation, discussed the buccal swabs of the defendants as they related to evidence found at the crime scene. Mr. Stoner examined over ten items and on most of the evidence tested, he found the victim's DNA and at least one unidentified male DNA profile. In testing the metal pole found at the crime scene, Mr. Stoner identified two DNA profiles, including the victim's and an unidentified male. On a white clothespin found at the crime scene, Mr. Stoner noted "reddish brown staining," and in testing the same he identified the victim's DNA. In testing the remainder of the clothespins, Mr. Stoner identified at least one unknown male's DNA. The State entered Mr. Stoner's report into evidence.

Forensic pathology expert David Zimmerman detailed the injuries suffered by the victim on June 26, 2014. At the time, the victim was thirty-nine years old, weighed one hundred and ten pounds, and had no drugs or alcohol in her system. Dr. Zimmerman stated the victim's cause of death to be multimodality trauma by beating and strangulation.

He further detailed her injuries at trial stating the victim suffered "bruises and scrapes" on her neck. "There was hemorrhage in -- or bleeding in the muscles of the neck, and bleeding in the tissue surrounding the airway." She suffered petechiae, or "tiny pinpoint sized spots of bleeding," in the whites of her eyes. The tissue of the victim's larynx and trachea was red and swollen. These injuries "inhibit[ed] her ability to breathe through a normal manner." After reviewing a photograph of the victim hanging by her arms from the ceiling, Dr. Zimmerman explained:

> Extended hanging like this from the -- it looks like it's from the arms, the muscles of the chest that have to do with breathing, if they're stretched like that with the arms above the head it's going to make the -- it's going to make it more difficult to breathe as time goes on. The breathing muscles are meant to work most efficiently when the arms are down at the sides.

The victim suffered multiple injuries to her face, including bruises to her ears and forehead, around her eyes, and on her chin. The victim also had abrasions on her chin and ears. She suffered subgaleal bruises, or bruises "right up against the skull," and confluent, or overlapping, contusions throughout her body. The victim's chest, abdomen, back, hips, and buttocks were covered in "multiple extensive and confluent contusions" resulting in the bruising of approximately 75 to 80 percent of her body. Specifically, "[t]here were oval and linear contusions on the left side of the chest, the right lower abdomen, and the back." He opined the linear bruises likely occurred "from being struck

with some long hard object" like the metal pole found at the crime scene and noted the oval bruises probably resulted from "anything like a punch or a kick."

The victim had multiple rib fractures and a fractured sternum resulting from blunt trauma, not CPR. Of the twelve ribs on each side of the chest, the victim suffered six broken ribs on her left side and seven broken ribs on her right side. Furthermore, "[t]here was a laceration or a tear of the liver, and there was [approximately 250 milliliters of] blood in the abdominal cavity, and there was bruising of the small intestines." Dr. Zimmerman opined the victim's small intestine, specifically the duodenum, was damaged from a forceful kick as it is "very deep inside the abdomen." The victim's internal bleeding resulted from the lacerations to her liver. Additionally, Dr. Zimmerman stated:

> There were multiple confluent bruises of the upper arms and forearms. There were bruises on the palms and the backs of the hands. There were bruises on the tops and soles of the feet. There were bruises of the thighs. There were bruises on the lower legs. And there was another linear bruise on the left upper thigh.
>
> . . .
>
> There were abrasions of the nipples of the breasts. There were abrasions of the labia minora; that's the external genitalia. And some postmortem insect activity.

Dr. Zimmerman opined all of the injuries detailed above contributed to the victim's death. The State then closed its proof.

Upon the defendants' motions for judgments of acquittal and as conceded by the State, the trial court dismissed the aggravated sexual battery charges of counts three, four, and five. All of the defendants waived their right to testify and none offered any proof in their defense other than Vicchitto who sought to provide character evidence from his mother, Shirley Vicchitto. The trial court, however, denied entry of the same. As such, Vicchitto made an offer of proof from Ms. Vicchitto outside of the presence of the jury. Ms. Vicchitto testified Vicchitto is an Ogiba (sic) Indian who she and her husband adopted when he was two years old. She stated Vicchitto has excellent character but a "[v]ery limited" mental capacity. Further, she explained Vicchitto is legally blind, has cerebral palsy, suffers from depression, is learning disabled, and questions his sexuality. Ms. Vicchitto stated he had no criminal record prior to the present charges, but noted he "will do whatever he thinks will help him to fit in."

The jury then convicted the defendants in each of the three remaining counts, finding Richardson and Reynolds guilty of first degree murder, felony murder, and especially aggravated kidnapping. The jury found Skipper guilty of two counts of criminally negligent homicide and especially aggravated kidnapping. Finally, the jury convicted Vicchitto of two counts of facilitation of second degree murder and especially aggravated kidnapping. After sentencing hearings, the trial court imposed various sentences to each defendant. The trial court sentenced Reynolds to an effective life sentence while Skipper and Vicchitto each received effective twenty-five-year sentences. For his convictions, the trial court sentenced Richardson to life plus twenty-five years.

At Richardson's sentencing hearing, the State introduced the presentence report into evidence. Richardson then testified. He stated he was "terribly sorry about what happened" and he has "complete remorse" for the victim's death. Regarding the victim's beating, however, he also stated he "was doing what [he] thought was right by protecting someone [he] loved." Richardson admitted to hitting the victim "with a pole like three or four times" and acknowledged this was cruel behavior. Though he did not think his actions could cause life-threatening injuries or death, Richardson admitted to playing a major role in the victim's death.

Richardson acknowledged a 2008 domestic assault conviction and a 2013 misdemeanor theft conviction for which he was on probation on June 26, 2014. As to mitigating factors, Richardson claimed he assisted police by identifying Reynolds, Skipper, and Vicchitto as participants in the crimes against the victim. He further claimed the victim voluntarily submitted to the discipline session which led to her death pursuant to the BDSM lifestyle prevalent throughout the Wilson Court home. He did, however, admit the alleged BDSM session exceeded the boundaries of common practice. Richardson further claimed he did not want to be a part of the session at first, stating he was encouraged by the other defendants to participate and then his "rage just took over." During cross-examination, Richardson admitted to punching the victim, maintaining only Reynolds kicked the victim, and he did so over fifty times. Richardson agreed he obtained the metal pole to beat the victim when punching and kicking was not enough. Upon its review of the evidence presented, the trial court merged Richardson's convictions for first degree and felony murder and sentenced him to life in prison and imposed a consecutive sentence of twenty-five years for his especially aggravated kidnapping conviction.

The trial court denied the defendants' motions for a new trial. Each defendant timely appealed.

***Analysis***

*I.      Sufficiency of the Evidence*

On appeal, Richardson and Reynolds challenge the sufficiency of the evidence as to each of their three convictions while Skipper challenges sufficiency as it relates to her conviction for especially aggravated kidnapping.[4] We will address each conviction as it relates to each defendant in turn.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d

---

[4]Vicchitto does not contest the sufficiency of the evidence as it relates to his convictions. As such, it is not addressed in this appeal.

776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

### a. Especially Aggravated Kidnapping

Richardson, Reynolds, and Skipper challenge their convictions for especially aggravated kidnapping. Each defendant argues the victim voluntarily submitted to the BDSM lifestyle and her role as a house slave. As a result, the defendants assert the victim also submitted to the discipline session of June 26, 2014 which led to her death. Reynolds further suggests only Richardson committed especially aggravated kidnapping by engaging in the final beating during which all of the other participants urged him to stop. The State asserts "[e]ven under the most generous interpretation of the rules or guidelines for punishment in the BDSM community, the evidence does not support the argument that the victim consented to having her liberty restricted so that she could be beaten to death." We agree with the State.

Especially aggravated kidnapping occurs when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and "the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-302 (a); -305 (a)(4). Serious bodily injury includes "[a] substantial risk of death; [p]rotracted unconsciousness, [e]xtreme physical pain; . . . [or] [p]rotracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106 (a)(34).

Here, the defendants attempt to relieve themselves of culpability for the especially aggravated kidnapping of the victim by suggesting she consented to their treatment of her on June 26, 2014. The record, however, makes clear the defendants hung the victim by her arms from the ceiling of both the bedroom and the living room with a ball gag in her

mouth for over four hours prior to her death. The defendants suggest that because the victim previously submitted herself to discipline sessions in her role as a house slave, she consented to the actions that led to her death. We disagree.

Prior to hanging the victim from the ceiling, Richardson accused her of trying to poison him and Ms. Laughlin. As a result, Skipper ordered a discipline session for the victim. The session began by hanging the victim by her arms from the ceiling of Skipper's bedroom. When the beating became too detrimental to the electronics in the bedroom, Vicchitto and Reynolds moved the victim from her hanging position in the bedroom to a hanging position in the living room. She was not permitted to move independently. As she hung from the living room ceiling, Vicchitto placed a ball gag in her mouth which restricted her ability to speak. Skipper then ordered the number of strikes Richardson, Reynolds, and Vicchitto were to lay against the victim as she hung, unable to escape, from the ceiling. Though the victim could not speak, Ms. Wilkerson heard the victim cry out, moan, and groan throughout the beating.

Additionally, the victim passed out three times over the course of the four-hour beating. Each time, Reynolds and Vicchitto took the victim down from her hanging position, revived her, and re-hung her from the ceiling in order to inflict additional damage to the victim. Nothing in the record suggests the victim had control of any of her movements or the discipline session once the beating began. After the third time she passed out, Ms. Wilkerson stated the victim was unable to speak or stand on her own. Based upon the foregoing evidence, it is clear the defendants knowingly confined the victim by hanging her by her arms from the ceiling in order to inflict serious bodily injury upon her. Tenn. Code Ann. §§ 39-13-302 (a); -305 (a)(4). The defendants are not entitled to relief.

Furthermore, Ms. Ours, Ms. Laughlin, and Ms. Wilkerson testified neither Richardson nor Reynolds engaged in the BDSM lifestyle. Thus, any argument claiming the victim consented to the defendants' behavior fails as to Richardson and Reynolds as it is clear both participated in the four-hour-long beating of the victim during which she was not free to move on her own, to speak, or to end the beating of her own accord. The defendants are not entitled to relief as to this issue.

### b. First Degree, Premeditated Murder

#### i. Alphonso Richardson

The jury convicted Richardson of the first degree, premeditated murder of the victim. First degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202 (a)(1). In this context, premeditation is "an act done after the

exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202 (d). Tennessee Code Annotated section 39-13-202 (d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

In attacking the sufficiency of the evidence as to his first degree, premeditated murder conviction, Richardson argues "the elements of premeditation and intent are lacking," claiming the victim's death resulted from a BDSM "discipline session" that "spiraled out of control." Richardson argues "no evidence was presented that would demonstrate that [he] planned, intended, or wanted to kill [the victim], given the peculiar circumstances surrounding her death." The record, however, does not support this argument.

Instead, the evidence shows on June 26, 2014, Richardson participated in the four-hour-long beating of the victim as she hung by her arms from the ceiling of the home where she served as the house slave. The beating began after Richardson accused the victim of trying to poison him and Ms. Laughlin. Ms. Laughlin stated Richardson was "ranting and raving" throughout the beating. Ms. Wilkerson saw Richardson kick and

punch the victim in the waist, wrist, and legs. She saw Richardson choke the victim for thirty seconds. Unsatisfied with simply kicking and punching, Richardson then hit the victim with a metal pole ten to fifteen times, swinging it like a baseball bat across the victim's body. Ms. Laughlin described the sound of the metal pole hitting the victim's body as "loud and bone shattering." While Vicchitto and Reynolds took turns beating the victim, Richardson kept count of the blows the victim endured. At one point during the beating, Richardson paused for a picture. The picture shows him standing in front of the victim's body as she hung from the ceiling. In the picture, Richardson is wearing latex gloves and is holding the metal pole used to beat the victim.

At trial, Dr. Zimmerman described in detail the blunt trauma which killed the victim. The victim suffered bruising to 75 to 80 percent of her body, broken ribs and a broken sternum, internal bleeding, lacerations of the liver, and damage to her small intestine all of which contributed to her death. The victim suffered linear bruises on her chest, lower abdomen, back, and left upper thigh. Dr. Zimmerman opined these could have been caused by a long, metal pole like the one used by Richardson during the beating.

Looking specifically to the premeditation factors outlined by our Supreme Court, the record establishes Richardson was in a rage after believing the victim poisoned him and Ms. Laughlin. As a result, he participated in the four-hour-long beating of the victim in order to punish her. During the beating, the victim was restricted, unarmed, and unable to speak. Additionally, at various points over the four hours, Richardson paused for a picture as the victim hung from the ceiling, found a metal pole to use against her, and spoke to Ms. Laughlin about why the victim was being beaten. After the victim's death, Richardson went to a nearby laundromat and charged his cell phone. *See Bland*, 958 S.W.2d at 660. Additionally, Richardson failed to render aid to the victim despite her passing out three times over the course of the four-hour beating. Instead, every time she was revived, Richardson resumed beating the victim until her death. *Larkin*, 443 S.W.3d at 815-16. The record is sufficient to establish Richardson committed the first degree, premeditated murder of the victim.

Richardson suggests his first degree, premeditated murder conviction should be reduced to second degree murder. We again disagree. As noted above, the evidence shows Richardson participated in the beating of the victim while she was restrained from the ceiling. After hours of abuse during which Richardson presumably took a break while other participants beat the victim, Richardson obtained a metal pole in order to inflict additional and significant damage upon her. Furthermore, he continued to beat the victim despite pleas from others for him to stop. As such, the record supports the jury's finding of premeditation in that Richardson participated in the beating death of the victim "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202 (d).

- 15 -

We are in no way persuaded that the victim's death resulted from a "peculiar" discipline session enacted within the BDSM lifestyle. While the victim did submit herself to the BDSM lifestyle, Richardson's actions far exceeded the boundaries established within the same. Further, the evidence at trial asserts Richardson did not participate in the BDSM lifestyle and demonstrates he was angry with the victim prior to engaging in her prolonged beating from which she could not escape. The defendant is not entitled to relief as to this issue.

### ii. Matthew Reynolds

Similarly, the jury convicted Reynolds of the first degree, premeditated murder of the victim for his participation in the beating of June 26, 2014. As detailed above, the beating began in Skipper's room where the victim was restricted by her arms and hung from the ceiling. As the beating intensified, Vicchitto moved the victim from Skipper's bedroom to the living room so as to avoid damaging the electronics in the bedroom. Once in the living room, Reynolds and Vicchitto again hung the victim from the ceiling by her arms, and the beating resumed. Throughout the course of the beating, the victim lost consciousness three times. After each loss of consciousness, Reynolds and Vicchitto removed the victim from her position from the ceiling, revived her, and subsequently re-hung her from the ceiling for the beating to continue. During his turn beating the victim, Reynolds struck the victim in "a series of martial arts moves" to her waist, torso, and legs "more than 50" times. Dr. Zimmerman stated the victim suffered oval shaped bruises to her chest, abdomen and back which likely occurred from a punch or kick. Additionally, the victim's small intestine was likely bruised from a kick as it was deep inside the abdomen. All of the injuries suffered by the victim on June 26, 2014 contributed to her death, many of which resulted from Reynolds participation in the same.

Looking again to the *Bland* premeditation factors outlined by our Supreme Court, the record establishes Reynolds engaged in the cruel beating of the victim as she hung from the ceiling, unable to move or speak. Reynolds used his practiced skill in the martial arts to harm the victim, kicking her over 50 times and bruising her deep inside her abdomen. *See Bland*, 958 S.W.2d at 660. Each time after the victim passed out, Reynolds helped remove the victim from her hanging position, revived her, and replaced her in the restraints in order for the beating to resume. He did not render aid to the victim for nearly four hours as she was beaten to death. *Larkin*, 443 S.W.3d at 815-16. After killing the victim, Reynolds went to a laundromat as police reported to the crime scene.

As such, sufficient evidence exists to support the jury's verdict convicting him of first degree, premeditated murder. The defendant is not entitled to relief.[5]

### c. First Degree, Felony Murder

#### i. Alphonso Richardson and Matthew Reynolds

The jury also convicted Richardson and Reynolds of the first degree, felony murder of the victim committed during her especially aggravated kidnapping. First degree, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202 (a)(2).

In the present case, the evidence is sufficient to support the elements of first degree, felony murder against both Richardson and Reynolds. As noted above, Richardson and Reynolds participated in the especially aggravated kidnapping of the victim on June 26, 2014. Specifically, Richardson and Reynolds kidnapped the victim by hanging the victim by her arms from the ceiling, placing a ball gag in her mouth, beating the victim by kicking, punching, and wielding a metal pole, and causing the victim to lose consciousness three times. The victim suffered multiple traumatic injuries as a result of the beating inflicted by the defendants' during the kidnapping. This evidence is sufficient to support the defendants' convictions for especially aggravated kidnapping and first degree, felony murder in the perpetration of the especially aggravated kidnapping as Richardson and Reynold's actions on June 26, 2014 resulted in the victim's death. *Id.* at 167-68. Neither Richardson, nor Reynolds is entitled to relief as to this issue.

### II. Jury Instructions

Richardson and Reynolds lodge complaints against the trial court's jury instructions on flight and consent. Both contend the trial court erred in instructing the jury on flight, while only Richardson argues the trial court erred in instructing the jury on consent. The propriety of each instruction is addressed below.

It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793

---

[5]Reynolds also suggests the jury's verdicts were "inconsistent and erroneous" as he, Skipper, and Vicchitto were convicted of different crimes. However, because "[i]nconsistent verdicts may occur in trials of multiple defendants," the defendant is not entitled to relief as to this issue. *State v. Davis*, 466 S.W.3d 49, 72 (Tenn. 2015).

S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will only be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court 'must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008) (internal quotations omitted)).

### a. Consent

Richardson contends the trial court improperly instructed the jury on consent, arguing the instruction "left the jury with the impression that [the victim] could not, under any circumstances, willingly submit to confinement and likened the 'BDSM community' to an inherently criminal organization." The State asserts the instruction was an accurate statement of the law and "an accurate statement of the proof -- there was evidence the victim had consented to 'punishment' as a recognized member of the BDSM community." Our review indicates there is no error in the trial court's consent instruction.

Regarding consent, the trial court instructed the jury as follows:

You have heard evidence that the alleged victim is a voluntary member of the BDSM, bondage and discipline, dominance and submission, sadism and masochism community. You have also heard that by virtue of the voluntary membership the alleged victim granted prior consent to punishment, including kidnapping, that the BDSM community chose to impose. The BDSM community has not been recognized as a sovereign entity unto themselves, immune from the criminal laws of the state of Tennessee, nor has the BDSM community been granted a license to punish its members as within its sole discretion it deems necessary.

In charging the jury, the trial court likened the present case to this Court's holding in *State v. Mickens*. 123 S.W.3d 355, 392 (2003). The *Mickens* defendants attempted to absolve themselves of culpability for the kidnapping, beating, and death of their victims by arguing the victims, in joining the Gangster Disciples, consented to "all gang rules and punishments." *Mickens*, 123 S.W.3d at 392. This Court rejected the defendants' argument, stating "[w]e respectfully disagree that a civilized society can tolerate such

conduct or has so empowered the Gangster Disciples." *Id.* Similarly, we are not persuaded that the victim's participation in the BDSM community shields the defendants from culpability for their actions on June 26, 2014. Though the law permits consent for specific enumerated crimes, it is clear consent is not a defense for the defendants' crimes of murder and especially aggravated kidnapping. The trial court's jury charge simply clarified the applicable law that consent, despite the defendants' argument to the contrary, is not a defense to especially aggravated kidnapping or murder. The trial court did not err in instructing the jury concerning the defense of consent and Richardson is not entitled to relief for the same.

### b. Flight

Richardson and Reynolds argue the trial court erred in instructing the jury on flight, claiming evidence of flight did not exist at trial because they were found hours later at a laundromat less than half a mile from the crime scene. Both also suggest they did not attempt to hide from or evade police. The State asserts the proof at trial supported the flight instruction as the jury could have inferred Richardson and Reynolds sought to avoid prosecution by going to the laundromat after Vicchitto called 9-1-1. Again, we agree with the State.

Procedurally, and as argued by the State, we note Reynolds' challenge to the trial court's flight instruction fails as he has not provided any argument supporting his assertion that the trial court erred in this regard. Tenn. R. App. P. 27(a)(7)(A) (requiring an argument to set forth: "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"). As a result, his argument is waived.

Despite Reynolds' waiver, however, the record makes clear the trial court properly instructed the jury on flight and neither defendant is entitled to relief. At trial, the trial court instructed the jury on flight, as follows:

> The flight of a person accused of a crime is a circumstance which, when considered with all of the facts in the case, may justify an inference of guilt. Flight is the voluntary withdrawal of one self (sic) for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence present -- presented proves beyond a reasonable doubt that the Defendant fled is a question for your determination.

> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it

may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the Defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other -- other evidence when you decide the guilt or innocence of the Defendant. On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was a flight by the Defendants Alphonso Richardson and/or Matthew Reynolds, the reasons for it, and the weight to be given to it, are questions for you to determine.

The trial court's flight instruction follows that of the Tennessee Pattern Jury Instruction 42.18 which has been previously cited with approval by this Court. *See State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989); *State v. Douglas McArthur Wilson*, No. M2017-00432-CCA-R3-CD, 2018 WL 2106492, at *17 (Tenn. Crim. App. May 7, 2018).

Furthermore, sufficient evidence exists "to support a jury charge on flight where there is proof of 'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or leaving the community for parts unknown.'" *State v. Shawn Simmons*, No. M2009-01362-CCA-R3-CD, 2010 WL 3719167, at *4 (Tenn. Crim. App. Sept. 23, 2010) (quoting *State v. Burns,* 979 S.W.2d 279, 289-90 (Tenn. 1998) (internal quotations omitted)). "The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action." *Id.* (citing *State v. Terrance Wilks,* No. W 1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999)). The trial court should instruct the jury as to flight when it is properly raised by the proof. *Id.* at *5.

Upon our review of the record it is clear the evidence presented at trial called for the flight instruction. Ms. Laughlin stated after the defendants beat the victim for four hours, Vicchitto called 9-1-1 as the victim died on Skipper's bed. During the call, Reynolds left the house. After the completion of the 9-1-1 call, Richardson also left the house. The two defendants were not found until several hours later, at approximately 2:20 p.m., at a laundromat.

- 20 -

The defendants argue because the laundromat was less than one mile from the crime scene, they could not have intended to evade prosecution. We, however, disagree. Before leaving the home where the victim died, both men knew the police were en route. As such, they left the crime scene and were not found for approximately seven hours during which their roommates were under investigation for the victim's death. Accordingly, enough evidence existed at trial to support the trial court's jury instruction on flight and the defendants are not entitled to relief.

### III. *Character Evidence*

Vicchitto challenges the trial court's evidentiary ruling denying character evidence offered from his mother, Ms. Shirley Vicchitto, during trial. Vicchitto suggests "a character witness is an important witness and is admissible regardless of whether he testifies in his own defense." Further, he argues "the testimony from his [m]other would have made it known to the jury that it was not in his character to commit a crime of this nature." The State asserts the trial court did not err in denying Ms. Vicchitto's testimony, arguing "the exclusion of his mother's testimony was proper because propensity evidence is looked upon with disfavor." Our review of the record indicates the trial court properly denied Ms. Vicchitto's testimony.

Vicchitto sought to offer character evidence from his mother in an effort to show he did not have the capacity to commit the crimes for which he was charged. While a non-testifying defendant can offer character evidence at trial, the Tennessee Rules of Evidence limit the same. Rule 404 (a)(1) provides:

> Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> (1) *Character of Accused.* In a criminal case, evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same or, if evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under Rule 404(a)(2), evidence of the same trait of character of the accused offered by the prosecution[.]

Tenn. R. Evid. 404 (a)(1). The trial court denied Ms. Vicchitto's testimony as irrelevant under Rule 404 (a)(1), noting "she has no information at all about the facts at hand." We agree. Not only did Ms. Vicchitto testify she was unaware of Vicchitto's participation in the BDSM community, but her testimony also failed to address any of the facts at issue in the case. She had no knowledge of the events leading to the victim's death and her

testimony merely suggested she believed Vicchitto to be a good person. Though Ms. Vicchitto had knowledge of Vicchitto's educational, medical, and criminal history, her testimony regarding the same did not relate to the crimes for which he was charged. Therefore, Ms. Vicchitto's proposed testimony failed to meet the requirements of Rule 404 (a)(1) and the trial court properly excluded her testimony at trial. Vicchitto is not entitled to relief as to this issue.

## IV. Sentencing

Finally, Richardson challenges his sentence of life plus twenty-five years as excessive. He argues the trial court erred in imposing consecutive sentences after finding him to be a dangerous offender, claiming yet again that the victim's "death arose from a set of bizarre circumstances that will not likely be repeated and in which [] Richardson was not even the principle decision maker, [] Skipper was." The State asserts sufficient evidence exists to support the trial court's finding of Richardson's status as a dangerous offender, and we agree with the State.

When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). This Court also reviews consecutive sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W. 3d at 707; *Pollard*, 432 S.W.3d at 859-60. The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In imposing a sentence, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the defendant in his own behalf. Tenn. Code Ann. § 40-35-210 (b). In addition, the principles of sentencing provide that the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. *See* Tenn. Code Ann. § 40-35-103 (2), (4). To provide

meaningful appellate review, the trial court must state on the record its reasons for the sentence chosen. Tenn. Code Ann. § 40-35-210 (e).

After doing so, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210 (d)). The trial court shall consider, but is not bound by, the provision that "[t]he minimum sentence within the range of punishment is the sentence that should be imposed . . . [and] should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors." Tenn. Code Ann. § 40-35-210 (c); *Carter*, 254 S.W.3d at 346. A non-exclusive list of mitigating and enhancement factors are provided in Tennessee Code Annotated sections 40-35-113 and -114. The weighing of both mitigating and enhancement factors is left to the trial court's sound discretion, but a trial court's misapplication of a mitigating or enhancement factor will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

Further, Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Pursuant to statute, consecutive sentencing is warranted when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high" and "[t]he defendant is sentenced for an offense committed while on probation." Tenn. Code Ann. § 40-35-115 (b)(4), (b)(6). In imposing consecutive sentences based upon a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn.1999) (stating that the *Wilkerson* findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders).

Richardson challenges the trial court's imposition of consecutive sentencing, claiming the life sentence plus twenty-five years was unjust because the record does not support his dangerous offender status. This argument, however, is without merit. In sentencing Richardson, the record makes clear the trial court complied with the purposes and principles of sentencing before imposing a life sentence plus twenty-five years. Further, the trial court found the defendant was eligible for consecutive sentencing based

upon his criminal history, including his probation status at the time of the present crimes, and its determination that the defendant is a "dangerous offender." Tenn. Code Ann. § 40-35-115 (b)(2), (b)(4). The trial court explained:

All right, in this case, as we know, the jury found [] Richardson guilty on the first degree murder and felony murder and especially aggravated kidnapping. That verdict came in on April 1st, 2016. The two murder convictions will merge into the first [] degree murder for sentencing and under the law, that requires life imprisonment. That leads us to the especially aggravated kidnapping, an A Felony. Based on the information in the presentence report and the testimony, [] Richardson is a range one offender. That sentence would be fifteen to twenty-five years and as stated in the previous hearings, the [c]ourt vividly remembers the testimony from the trial and all the evidence presented. Based on that and the evidence submitted today, considering all the arguments, the principles of sentencing. With regard to the enhancement factors, number one is applicable as far as he does have a criminal history. Certainly, they are misdemeanors. It's not anything in the felony range. Number five is applicable, that he treated -- he did treat the victim with exceptional cruelty during the commission of the offense. Number six, the personal injuries inflicted upon [the victim] were great. Number ten is applicable, that there was no hesitation about committing the crime when the risk to human life was high, and then of course, thirteen is also applicable in that at the time that the felony was committed, [] Richardson was on probation.

I have heard the arguments of counsel regarding the mitigating factors and the [c]ourt is not persuaded that those mitigating factors are applicable. He may have assisted the authorities, that was after the fact when he had been apprehended and I believe they were all pointing fingers at each other at that time, and he didn't participate in the cover up because he left once it was determined that [the victim] was deceased and he didn't probably even know the details of the story.

Also, with regard to the mitigating factor number eleven, the [c]ourt does not find that that is applicable either. Certainly, the BDSM lifestyle was unique, but that is not the issue here. [The victim] was beaten to death. [T]hat's just the bottom line of the proof in this case and whether she initially consented -- maybe she did, but she was tied up and gagged and unable to speak for herself when all this was going on.

So, the question then on the especially aggravated kidnapping based on those enhancement factors, the sentence will be the max of twenty-five years because again, of the exceptional cruelty and the brutal beating that we heard about, multiple fractures and internal lacerations obviously resulted from that cruel treatment.

But then we look at the consecutive sentencing issue and in reviewing the factors set forth regarding consecutive sentencing, particularly 40-35-115 (b)(4), the [d]efendant is a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing the crime when the risk to human life was high and the circumstances surrounding the offense were aggravated, confinement is necessary to protect society, and the length of the sentence reasonably relates to the offenses. [S]o the [c]ourt does find in this case that consecutive sentencing to be applicable so the especially aggravated kidnapping will be twenty-five years consecutive.

In finding Richardson eligible for consecutive sentencing, the trial court noted he engaged in the "exceptional cruelty and the brutal beating" of the victim which resulted in her death. As a result, the trial court found Richardson to be a dangerous offender and stated his behavior indicated no regard for human life and that he had no hesitation for committing a crime where the risk to human life was high. Richardson admitted the crimes committed against the victim were cruel and evidence of the same is detailed extensively throughout this opinion. It is clear Richardson engaged in the prolonged beating of the victim during which she suffered extensive traumatic injuries while hanging by her arms from the ceiling. Additionally, the record illustrates Richardson had a criminal history for which he was on probation at the time of the victim's kidnapping and murder. Accordingly, we conclude the criteria relied upon by the trial court are explicit in the record and support the court's consecutive sentencing as to Richardson's convictions. The trial court did not abuse its discretion, and we affirm the trial court's sentence.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the defendants' convictions, Richardson's sentencing, and the evidentiary rulings and jury instructions of the trial court, but remand this cause to the trial court for sentencing and the entry of completed judgment forms as to counts one and two for each defendant.

- 25 -

_____
J. ROSS DYER, JUDGE